UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| HAWAII FOODSERVICE ALLIANCE, LLC, A HAWAII LIMITED LIABILITY COMPANY; | CIV. NO. 21-00460 LEK-WRP |
| Plaintiff, | |
| vs. | |
| MEADOW GOLD DAIRIES HAWAII, LLC, A HAWAII LIMITED LIABILITY COMPANY;  HOLLANDIA DAIRY, INC., A CALIFORNIA CORPORATION; HERITAGE DISTRIBUTING COMPANY, SAPUTO DAIRY FOODS USA, LLC, A DELAWARE CORPORATION; | |
| Defendants. | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On July 24, 2023, Defendants Meadow Gold Dairies

Hawaii, LLC ("MGDH"), Hollandia Diary, Inc. ("Hollandia"),

Heritage Distributing Company doing business as Ninth Avenue

Foods ("Heritage" or "NAF"), and Saputo Dairy Foods USA, LLC

("Saputo" and collectively "Defendants") filed a Motion for

Summary Judgment ("Motion"). [Dkt. no. 123.] Plaintiff Hawaii

Foodservice Alliance, LLC ("Plaintiff") filed its memorandum in

opposition on September 22, 2023, and Defendants filed their

reply on September 29, 2023. [Dkt. nos. 147, 150.] This Court

finds this matter suitable for disposition without a hearing

pursuant to Rule LR7.1(c) of the Local Rules of Practice for the

United States District Court for the District of Hawaii ("Local Rules"). Defendants' Motion is hereby granted in part and denied in part for the reasons set forth below. Summary judgment is granted in part in favor of MGDH, and the Motion is denied to the extent that it seeks summary judgment in favor of Hollandia, Heritage, and Saputo.

## <u>BACKGROUND</u>

The crux of this case is that Plaintiff alleges MGDH's use of phrasing and imagery suggesting that Meadow Gold brand products are sourced in Hawai`i is misleading and deceptive because Meadow Gold products contain milk and other products, such as whipping cream, imported from the continental United States ("Mainland Milk Products").

Plaintiff initiated this action on November 24, 2021. <u>See</u> Complaint, filed 11/24/21 (dkt. no. 1).[1] The operative pleading is Plaintiff's Second Amended Complaint, filed on February 1, 2023. [Dkt. no. 83.] Plaintiff asserts the following claims: false designation of origin and advertising and unfair competition, in violation of the Lanham Act, Tile 15 United States Code Section 1125(a) ("Count I"); an unfair methods of competition claim, in violation of Hawai`i Revised Statutes Chapter 480 ("UMOC" and "Count II"); a false advertising claim,

---

[1] Plaintiff filed its First Amended Complaint on April 18, 2022. [Dkt. no. 49.]

2

pursuant to Hawai`i Revised Statutes Section 708-871 and
Section 603-23.5 ("Count III"); and a deceptive trade practices
claim, pursuant to Hawai`i Revised Statutes Chapter 481A
("Count IV").

     The parties agree that, "[f]rom at least 1986 to 2020,
the Meadow Gold brand operated as a subsidiary of various
successive mainland conglomerates," the most recent of which was
Southern Foods, which later became Dean Foods. [Defs.' Separate
Concise Statement of Facts, filed 7/24/23 (dkt. no. 124)
("Defs.' CSOF"), at ¶¶ 4-5; Pltf.'s Concise Statement of Facts
in Opp. to Defs.' Motion for Summary Judgment as a Matter of Law
Filed July 24, 2023, filed 9/22/23 (dkt. no. 148) ("Pltf.'s
CSOF"), at ¶¶ 4-5 (admitting Defs.' ¶¶ 4 and 5).] Dean Foods
held Meadow Gold Dairies ("MGD") for approximately twenty years,
until its bankruptcy in 2020. [Defs.' CSOF at ¶ 5; Pltf.'s CSOF
at ¶ 5.]

     Plaintiff "is the largest milk distributor in Hawai`i,
with about 65% of the wholesale milk distribution market," and
MGDH has "about 35% of the market." [Defs.' CSOF at ¶¶ 26-27;
Pltf.'s CSOF at ¶¶ 26-27 (admitting Defs.' ¶¶ 26-27, "to the
extent 'the wholesale milk distribution market' is defined as
milk product sales to retailers and does not include other
sales, such as MGDH's sales to schools").]

Hollandia, Heritage, and Saputo (collectively "the Dairy Farmers") supply products to MGDH. [Second Amended Complaint at ¶¶ 7-9; Defs.' Answer to Second Amended Complaint [Dkt. 83], filed 3/1/23 (dkt. no. 88) ("Answer"), at ¶ 5 (admitting those portions of Plaintiff's ¶¶ 7-9).] Specifically, "MGD[H] entered into transactions with Hollandia, Heritage, and Saputo to supply mainland milk." [Defs.' CSOF at ¶ 33; Pltf.'s CSOF at ¶ 33 (admitting that portion of Defs.' ¶ 33).] MGDH also has agreements "with packaging vendors and advertising firms to supply Hawai`i-themed marketing." [Defs.' CSOF at ¶ 32; Pltf.'s CSOF at ¶ 32 (admitting that portion of Defs.' ¶ 32).] The packaging and marketing at issue in this case include the use of the terms "Hawaii's Dairy" and "Made with Aloha" and the suggestion of a connection with the "Dairymen's Association," [Second Amended Complaint at ¶ 1,] and the use of Meadow Gold's mascot "Lani Moo," [id. at ¶ 28].

I.   **Defendant's Evidence**

In 2020, Bahman Sadeghi ("Sadeghi"), through MGD Acquisition, LLC purchased certain Meadow Gold intellectual property ("IP"), a processing facility in Hilo, and distribution operations on the Island of Maui and the Island of Kaua`i from Dean Foods ("MGDH Acquisition"). Defs.' CSOF, Decl. of Bahman Sadeghi ("Sadeghi Decl.") at ¶ 3; Further Concise Statement ("Defs.' Reply CSOF"), filed 9/29/23 (dkt. no. 151),

Supplemental Declaration of Bahman Sadeghi ("Sadeghi Reply Decl.") at ¶ 5; see also Sadeghi Decl., Exh. 1 (Intellectual Property Assignment Agreement between Dean Foods Company and MGD Acquisition, LLC, effective 4/30/20). MGD Acquisition, LLC obtained, inter alia, the registered trademarks for "Lani Moo," "Dairymen's," and "Hawaii's Dairy."[2] [Sadeghi Decl., Exh. 1, Exh. A (Assigned IP).]

Sadeghi was the owner and operator of Island Dairy, a dairy farm on the Island of Hawai`i, from 1986 until he sold the farm in December 2011. During that time, Island Dairy sold milk to Meadow Gold Dairies. [Sadeghi Decl. at ¶ 2.] Based on his experience in the Hawai`i dairy industry, Sadeghi states:

> Until the 1980s, Meadow Gold sourced nearly all of its milk from Hawai`i dairy farms. But in the 1980s and 1990s, milk production declined steeply, which led to an increase in mainland imports. Meadow Gold began importing milk in bulk from the mainland in the mid-1990s. Since then, Meadow Gold has sourced the majority of its milk from the mainland. Other distributors rely solely on mainland milk imports. By the 2000s, this was not only common industry knowledge, but was also widely reported to the public. Today, MGD[H] is the only dairy distributor in the islands that has a local source of milk. It is also the only

---

[2] MGD Acquisition, LLC was later re-named Meadow Gold Dairies Hawaii, LLC. [Sadeghi Decl. at ¶ 3.] The name change occurred after the Dairy Farmers of America ("DFA"), which bought the Meadow Gold assets outside of Hawai`i, licensed "Meadow Gold" to what became MGDH for use in Hawai`i. See Sadeghi Reply Decl. at ¶ 3. This Order will therefore use "MGDH" to refer to MGD Acquisition, LLC.

dairy distributor in the islands with an
operating milk processing facility.

[Id. at ¶ 5.] Defendants also cite articles and reports that
corroborate Sadeghi's statements about the changes in the
Hawai`i dairy industry. See Defs.' CSOF, Decl. of Erika L.
Amatore ("Amatore Decl."), Exh. 2 (Clare Gupta, *Dairy's Decline
and the Politics of "Local" Milk in Hawai`i*, Food, Culture & Society
(Vol. 19, Issue 3, Sept. 2016)) at 497);[3] Motion, Mem. in Supp.
at 4-5 (citing Haw. Dep't Ag. C.N. Lee, Issues Related to
Hawai`i's Dairy Industry at 15, available at
https://hdoa.hawaii.gov/wp-content/uploads/2013/01/Appendix-B-
Dairy.pdf (last visited July 20, 2023); HONOLULU MAGAZINE,
Milking It, Aug. 5, 2008, available at
https://www.honolulumagazine.com/milking-it/ (last visited
July 20, 2023)). As to the public's knowledge about the practice
of using Mainland Milk Products, Defendants cite: KHON2, *Hawai`i
Milk Producers Fight for Survival in Competitive Market*, June
30, 2015, available at https://www.khon2.com/news/hawaii-milk-
producers-fight-for-survival-incompetitive-market/ (last visited
July 20, 2023); HAWAII NEWS NOW, *Last Hawaii-Owned Large Dairy
May Close*, June 30, 2015, available at

_____

[3] Ms. Amatore states Exhibits 2 to 17 "are true and correct
copies of newspaper articles and advertisements obtained by
[her] office from the United States Library of Congress."
[Amatore Decl. at ¶ 2.]

https://www.hawaiinewsnow.com/story/29448178/last-hawaii-owned-large-dairymay-close/ (last visited July 20, 2023)). [Motion, Mem. in Supp. at 5.]

Sadeghi "purchased Meadow Gold as part of an effort to preserve and restore Hawai`i's dairy farms and dairy industry," and "[t]he Meadow Gold brand and IP was key to MGD[H]'s local dairy revitalization strategy[.]" [Sadeghi Decl. at ¶¶ 5-6.] Sadeghi relied on the fact that he would be able to continue to follow Dean Foods's practice of using Hawai`i-themed IP, without regard to the issue of whether Meadow Gold brand milk products came from a local source or from the mainland. [Id. at ¶ 7.] Sadeghi has spent over $625,000 to use and expand upon Meadow Gold's Hawai`i-themed marketing, including the "Made with Aloha" tagline. [Id. at ¶ 10.] According to Sadeghi, the Dairy Farmers did not have any role in the determination of the content on Meadow Gold packaging. [Id. at ¶ 11.]

Sadeghi states that, with one exception that is not relevant to the instant case, all of the current Meadow Gold brand products "are essentially identical to the products previously offered by Meadow Gold under Dean Foods." [Id. at ¶ 8.] It is Defendants' position that the Hawai`i-themed taglines at issue in this case were in use long before MGDH acquired the brand. According to Sadeghi, "Meadow Gold . . . was founded in 1897 as the Oahu Dairymen's Association brand";

7

Meadow Gold's "beloved mascot, 'Lani Moo,' . . . was introduced
in 1949"; and Meadow Gold has sponsored the American Youth
Soccer Association ("AYSO") in Hawai`i for over fifty years.
[Id. at ¶ 6.] Meadow Gold was using the tag-line "Made with
Aloha" before Sadeghi purchased the brand, and he states that
tagline was used by Dean Foods. Id. at ¶ 10; see also Defs.'
CSOF, Decl. of Jerry Linville ("Linville Decl.") at ¶ 4 ("During
the entire time I worked for Meadow Gold under Dean Foods, the
brand used the tagline 'Hawaii's Dairy' in its advertising and
marketing materials").[4]

        Defendants characterize Meadow Gold's marketing of
Lani Moo as "aggressive[] and consistent[] since her
introduction in 1949." See Motion, Mem. in Supp. at 6 (citing
Amatore Decl. ¶ 2, Ex. 3-12 (selection of newspaper articles and
advertisements featuring Lani Moo dating from May 22, 1950 to
June 30, 1991)); see also id. at 6 & n.3 (citing Amatore Decl.
¶ 2, Ex. 6 (Bob Krauss, In One Ear, THE HONOLULU ADVERTISER, Nov. 22,
1960 ("There is not one kid in the 50th state who is not on
speaking terms with Lani Moo.")); The Honolulu Zoo Bids Aloha to
Beloved Lani Moo, HONOLULU MAGAZINE, April 26, 2022, Available at

_____

        [4] Jerry Linville ("Linville") is MGDH's Foodservice and
Military Contracts Manager. [Linville Decl. at ¶ 2.] He "worked
for the Meadow Gold brand under Dean Foods for sixteen years in
various positions, including sales manager." [Id. at ¶ 3.]

https://www.honolulumagazine.com/the-honolulu-zoo-bids-aloha-
tobeloved-lani-

moo/#:~:text=%E2%80%9CWe%20are%20deeply%20saddened%20by,She%20wi
ll%20be%20dearly%20missed.%E2%80%9D (last visited July 20, 2023)
(reporting the passing of the latest Meadow Gold Dairies
ambassador, "Lani Moo" and noting that "she has been the
ambassador of health and nutrition for Meadow Gold for more than
70 years")).

The advertisements that Defendants' counsel obtained
from the Library of Congress also show that Meadow Gold was
using the tagline "Hawaii's Dairy" since at least 1990. See
Amatore Decl., Exh. 11 (advertisement dated April 25, 1990),
Exhs. 13-15 (advertisements dated 1992-1999). Meadow Gold's
advertising also emphasized its origins as the Dairymen's brand.
See id., Exhs. 16-17 (2000 and 2008 advertising materials
referencing "Dairymen's" origins).

Defendants submit photographs from November 25, 2005,
October 2007, and late 2010, showing Meadow Gold products
bearing the "Hawaii's Dairy" label. [Linville Decl. at ¶¶ 5-7;
id., Exhs. 21-23.] Linville states that all of the Meadow Gold
products depicted in those photographs contained dairy from
mainland sources. [Linville Decl. at ¶¶ 5-7.] Defendants also
submit evidence that, in 2013, Meadow Gold and VIVA, a Meadow
Gold "sister brand," went through a graphics upgrade. [Id. at

9

¶ 8; id., Exh. 24 (Meadow Gold VIVA Branded Milk Graphics Upgrade information sheet circulated within Meadow Gold during the fourth quarter of 2013).] "After the graphics upgrade, all milk sold under the Meadow Gold brand, including milk sourced from the mainland, had labels that included 'Hawaii's Dairy.'" Linville Decl. at ¶ 8; see also id., Exh. 25 (photograph taken by Linville in February 2014, showing milk cartons with the new graphics being sold at a commissary), Exh. 26 (approved product image proofs, dated March 2015).

Defendants also submit an email chain from April 2020, showing that Joni Marcello ("Marcello") of Dean Foods, the Area Sales Director - Hawaii/Meadow Gold Dairies, included "Made with Aloha" and an image of Lani Moo within her email-signature. [Linville Decl., Exh. 27 (emails from Marcello to Linville and others, dated from 4/25/20 to 4/28/20).]

JB Brands, Inc., a Honolulu marketing company, has worked with the Meadow Gold brand since 1999. [Defs.' CSOF, Decl. of Jon Bryan ("Bryan Decl."), at ¶¶ 2-3.[5]] Bryan states:

> Over the years, I have developed and
> delivered marketing strategies and advertising
> materials for Meadow Gold. During all of my time
> working with Meadow Gold, its branding has always
> been very locally-focused, and has always drawn
> on its Hawai`i roots. As far as I can recall,
> Meadow Gold has always used the tagline "Hawaii's
> Dairy." Likewise, as far back as I can recall,

---

[5] Jon Bryan ("Bryan") is the founder of JB Brands, Inc. [Bryan Decl. at ¶ 2.]

> Meadow Gold has used romance copy referencing its origins as the Dairymen's Association.

[Id. at ¶ 4.] Defendants submit examples of the advertising and marketing materials that Bryan created for Meadow Gold:

-a 2009 television commercial that "draws heavily on local imagery and verbiage, and emphasizes its local roots and long history in the islands"; [id. at ¶ 5; id., Exh. 18;]

-a banner created in 2013 for the Honolulu Zoo stating, "Welcome to the Home of Lani Moo!" and including the phrase "Hawaii's Dairy"; [Bryan Decl. at ¶ 6; id., Exh. 19;] and

-a flyer created in 2013 for an AYSO promotion at a University of Hawai`i women's soccer game, identifying Meadow Gold as a sponsor and including the phrase "Hawaii's Dairy"; [Bryan Decl. at ¶ 7; id., Exh. 20;].

Bryan states these "are only a small sampling of the many advertisements and marketing materials [he has] developed for Meadow Gold, all of which have for decades invoked Meadow Gold's local origins. [Bryan Decl. at ¶ 8.]

## II. **Plaintiff's Evidence**

Plaintiff raises evidentiary objections to many of the statements in the Sadeghi Declaration about the history of Meadow Gold's operations. Plaintiff argues his statements lack foundation and some of his statements are based upon an article that is not authenticated and are not accurate representations

11

of the content of the article. <u>See</u> Pltf.'s CSOF at ¶¶ 7, 9-13 (citing FRE 602, 802, 901). It is not necessary for this Court to resolve Plaintiff's objections because the statements that Plaintiff objects to are not necessary to the resolution of the Motion. To the extent that any of the materials that Plaintiff objected to are cited in this Order, they are cited is for background purposes only, and they are not relied upon by this Court.

Plaintiff does "admit [that] Hawaii milk production began declining after 1982 and [that] certain imports began in 1984," but Plaintiff disputes Defendants' statements about the degree of the decline and the import of Mainland Milk Products. <u>See</u> <u>id.</u> at ¶ 8; <u>see also</u> Defs.' CSOF at ¶ 8. Plaintiff admits that:

-Meadow Gold "marketed Lani Moo in various forms since 1949"; [Pltf.'s CSOF at ¶ 14;]

-"Lani Moo has been featured in advertising for decades"; [<u>id.</u> at ¶ 17;] and

-Meadow Gold has used the phrase "Hawaii's Dairy" in its advertisements since 1990 (although Plaintiff disputes that the phrase began to appear on milk containers in 1990), [<u>id.</u> at ¶ 18].

Plaintiff distinguishes between Mainland Milk Products that are packaged in Hawai`i and Mainland Milk Products that are

12

packaged on the mainland. See id. at ¶ 21 ("The majority of the MGDH products depicted do not reflect 'Hawaii's Dairy' and those that do were packaged in Hawaii; no labels created for milk packaged on mainland reflected 'Hawaii's Dairy' prior to MGD[H]."); id. at ¶ 22 (stating Plaintiff "admits some mainland tanker milk processed and packaged in Hawaii may have included 'Hawaii's Dairy' but dispute that phrase was on labels created for milk packaged on mainland").

Plaintiff also appears to contest only the degree to which contested images and phrases were used. See, e.g., Defs.' CSOF at ¶ 24 ("After the graphics upgrade, all milk sold under the Meadow Gold brand, whether sourced from the mainland or not, had labels that included 'Hawaii's Dairy.'"); Pltf.'s CSOF at ¶ 24 (disputing Defs.' ¶ 24, but stating only that: "All milk did not contain 'Hawaii's Dairy' after the graphics upgrade."); Pltf.'s CSOF, Decl. of Joni Marcello ("Marcello Decl.") at ¶ 7 ("To the best of my recollection, Dean Foods began importing into Hawaii fluid milk and dairy products containing milk from cows on the U.S. mainland that were processed, packaged, and labeled on the U.S. mainland with the 'Meadow Gold' brand, such as extended shelf life ('ESL') and other milk or dairy products

(collectively, 'Mainland Packaged Milk Products')." (emphases omitted)).[6]

> According to Marcello:
>
> 3.  It is my understanding based on information and materials I gathered during my time with Dean Foods that the "Meadow Gold" brand originated on the U.S. mainland and by the 1950s was owned by Beatrice Foods Co., which purchased the Dairymen's Association in 1953.
>
> 4.  In or about 1959, I understand that the Dairymen's Association became known as "Meadow Gold Dairies Hawaii" . . . .

[Marcello Decl. at pgs. 2-3.] Plaintiff also points out that Sadeghi acknowledged during his deposition that the Meadow Gold brand originated in the Continental United States. [Pltf.'s CSOF, Decl. of Kelly G. LaPorte ("LaPorte Decl."), Exh. B (trans. excerpts of Sadeghi's 9/18/23 video conference deposition ("Sadeghi Depo.")) at 68.] According to Meadow Gold Dairy's website, Meadow Gold started in 1901 as a creamery in Topeka, Kansas. [LaPorte Decl., Exh. L (screenshots of various pages on MGD's website (https://www.meadowgolddairy.com), taken by Mr. LaPorte on 6/29/23) at PageID.1353.]

---

[6] Joni Marcello was employed by Dean Foods Company or its predecessor Southern Foods Group, LLC (collectively in the Marcello Declaration "Dean Foods") from November 1999 to April 2020. Her positions included, *inter alia*, Area Sales Director of Hawaii from 2008-2017 and 2018-2020. [Marcello Decl. at ¶ 1.] She was a MGDH Sales Manager from mid-2020 to May 2021, and she has been employed by Plaintiff since August 2021. [Id.]

When she was Dean Foods' Area Sales Director for Hawai`i, Marcello "was involved in the review and approval of labels used on Dean Foods' products sold in Hawaii that also included the Dean Foods corporate packaging and regulatory team." [Marcello Decl. at ¶ 8.] According to Marcello, Dean Foods had a policy that Hawai`i-themed content would not be used in the labels for Mainland Packaged Milk Products because it might cause customer confusion. [Id. at ¶ 9.] She further states that,

> labels created specifically for use on Mainland Packaged Milk Products never contained Hawaii-related content, including the phrases "Hawaii's Dairy," "Made with Aloha," and "MOOhalo," a depiction of Lani Moo, reference to "Dairymen's" or "Dairymen's Association," or the following statement:
>
>> In 1897 seven O`ahu dairy farms united as the Dairymen's Association, Ltd, to manufacture fresh milk for the community. Through the support of Hawai`i families, we grew to become Meadow Gold Dairies in 1959. Today we operate statewide and continue to manufacture fresh milk, dairy, juice and nectar products in Hawai`i. Generations of loyal Island families enable us to maintain our tradition of giving back to the communities we serve.

[Id. at ¶ 10.] The passage that Marcello quotes will be referred to as the "Dairymen's Text." Marcello also states that these phrases and the Dairymen's Text were not used on labels for milk products that Dean Foods processed and packaged in Hawai`i. [Id. at ¶ 14.] Further,

15

> [d]uring different periods of time, the phrase "Hawaii's Dairy" was used on labels for some products processed and packaged by Dean Foods in Hawaii that could contain milk that was imported in large tanks from dairies on the U.S. mainland ("Mainland Tanker Milk"). It was never used universally on all milk products processed and packaged by Dean Foods in Hawaii under the Meadow Gold brand.

[Id. at ¶ 13.]

As to the graphics upgrade described in the Linville Declaration, Marcello denies that the purpose of upgrade was to add "Hawaii's Dairy" on all Meadow Gold product labels, and she states the upgrade was used to address milk purity issues. [Id. at ¶ 15.]

As to the MGDH Acquisition, Marcelo states MGDH did not purchase all of Dean Foods' assets in Hawai`i, and one of the things that MGD did not purchase was the dairy processing facility in Honolulu where Meadow Gold brand products, and other products for other brands, were packaged and distributed ("Honolulu Dairy Processing Facility"). [Id. at ¶ 5.] According to Marcelo, the Honolulu Dairy Processing Facility had been the largest dairy processing facility in the state and, because MGDH chose not to purchase it, MGDH "began obtaining a significant amount of milk products packaged and labeled . . . in San Marcos, California by Hollandia . . . ." [Id. at ¶¶ 5-6.]

The assets involved in the MGDH Acquisition did not constitute the majority of Dean Foods' assets. DFA purchased the

16

majority of Dean Foods' assets, including Meadow Gold's operations in the continental United States and the Meadow Gold trademark. MGDH has a license from DFA to utilize the Meadow Gold brand. [LaPorte Decl., Exh. B (Sadeghi Depo.) at 70-71.]

In the MGDH Acquisition, MGDH refused to acquire Dean Foods' obligations to MGD employees in Hawai`i, including any obligations under the collective bargaining agreements that the Hawai`i employees had. MGDH also refused acquire the obligations to fund the Hawai`i employees' benefit plans or pension plans. [Id. at 75.] Plaintiff also asserts the MGDH Acquisition "was conditioned on [MGDH] **not** being deemed a 'legal successor' or 'alter ego' of Dean Foods." [Pltf.'s CSOF at ¶ 35 (citing LaPorte Decl., Exh. C (4/28/20 Bankruptcy Order)[7] at 26, ¶ 16) (emphasis in original);[8] Defs.' Reply CSOF at ¶ 35 (stating

---

[7] Exhibit C to the LaPorte Declaration is the Order (A) Authorizing Sale of Certain of the Debtors' Hawaii Assets to Logix Capital, LLC and Affiliates Free and Clear of All Claims, Liens, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement and Related Documents, (C) Vacating that Certain Order Authorizing Sale of the Debtors' Hawaii Assets to Industrial Realty Group, LLC, and (D) Granting Related Relief, filed on April 28, 2020 in In re Southern Foods Group, LLC, et al., Case No. 19-36313 (DRJ), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Bankruptcy Order"). [Dkt. no. 148-8.]

[8] Paragraphs 1-34 of Plaintiff's CSOF respond to Defendants' CSOF, and paragraphs 35-41 are Plaintiff's Additional Material Facts.

17

Plaintiff's ¶ 35 is irrelevant but it is disputed in part on other grounds).] Paragraph 16 of the Bankruptcy Order states:

> 16.   The Buyer shall not be deemed, as a result of any action taken in connection with the [Asset Purchase Agreement ("APA"),[9] the consummation of the Transaction contemplated by the APA, or the transfer or operation of the Acquired Assets, including the Assigned Contracts, to (a) be a legal successor or otherwise be deemed a successor to the Debtors for any purpose (other than, for the Buyer, with respect to any obligations as an assignee under the Assigned Contracts arising after the Closing), (b) have, de facto or otherwise, merged with or into the Debtors, (c) be an alter ego or a mere continuation or substantial continuation of the Debtors, including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, MEPPA, ERISA, the Consolidated Omnibus Budget Reconciliation Act (COBRA), WARN (as defined below), CERCLA (as defined below), and any other environmental, health, and safety laws, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Americans with Disabilities Act of 1990 (as amended), the Federal Rehabilitation Act of 1973 (as amended), and the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* . . .

---

[9] Attached to the Bankruptcy Order is a partial version of the Asset Purchase Agreement - Dated as of April 22, 2020 by and Among Dean Foods Company, Each of the Subsidiaries of Dean Foods Company Listed on the Signature Pages Hereto, MGD Acquisition, LLC and ARS Holding, LLC ("APA"). [Dkt. no. 148-8 at PageID.1106-228.] The Schedules to the APA are not included. See LaPorte Decl., Exh. C at PageID.1110 (list of Schedules). MGD Acquisition, LLC is identified as the "Operations Buyer" and ARS Holding, LLC is identified as the "Owned Real Property Buyer." [Id. at PageID.1111 (APA at 1).] Sadeghi signed the APA as both the Manager of MGD Acquisition, LLC and the Manager of ARS Holding, LLC. [Id. at PageID.1178.]

[LaPorte Decl., Exh. C (Bankruptcy Order) at 26 (dkt. no. 148-8 at PageID.1089).]

According to Marcello, one of the first projects after the MGDH Acquisition was the development of new labels for Meadow Gold products sold in Hawai`i. She states the Dairy Farmers were consulted regarding the labels' content, and they had the opportunity to provide comments and objections to the elements of the design. [Marcello Decl. at ¶ 16.] Because MGDH was "focused on the concept of marketing MGD[H] as a 'local brand,'" it decided to include Hawai`i-themed content - including, *inter alia*, "Hawaii's Dairy," "Made with Aloha," images of Lani Moo, and the Dairymen's Text - on all labels, including those for Mainland Packaged Milk Products. [Id. at ¶¶ 17-18.] Marcello states she "raised the question of whether MGD[H] should use Hawaii-themed content on Mainland Packaged Milk Products and, despite acknowledgement that there could be some risk of challenge, the decision was made to proceed." Id. at ¶ 20; see also id., Exh. A (screenshots of May 22, 2020 email chain between Marcello, Sadeghi, and Glenn Muranaka ("Muranaka")).

Plaintiff submits package label proofs for Meadow Gold brand products to be sold in Hawai`i that were produced by Defendants during discovery. [LaPorte Decl., Exh. D.] Plaintiff also submits photographs of Meadow Gold brand products purchased

19

by Plaintiff in Hilo, Hawai`i. [Id., Exh. E (photographs compiled by Mr. LaPorte).] Plaintiff argues the labels that MGDH used after April 2020 "included, among other things, phrases, statements, and words that Dean Foods had never placed on similar milk products sold at retail in Hawaii and all of which suggested that the Mainland Milk Products originated in Hawaii." [Mem. in Opp. at 5.]

Chad Buck ("Buck") formed Plaintiff in May 1999, and he is currently Plaintiff's Manager. Plaintiff began its milk and dairy distribution in approximately 2008. [Pltf.'s CSOF, Decl. of Chad Buck ("Buck Decl.") at ¶¶ 1-2.] Buck states that,

> [p]rior to May 2020, I was aware that Dean Foods imported into Hawaii milk and dairy products containing milk from cows on the U.S. mainland that were processed, packaged, and labeled on the U.S. mainland with the "Meadow Gold" brand, such as extended shelf life ("ESL") and other milk or dairy products (collectively, "Mainland Packaged Milk Products").

[Id. at ¶ 5.] "At some point," Buck learned that Dean Foods could not meet its demand for milk and dairy products in Hawai`i because of the closure in approximately 2007 of the last major dairy farm on Island of O`ahu and that Dean Foods would start importing Mainland Tanker Milk to be processed in the Honolulu Dairy Processing Facility. [Id. at ¶ 12.] However, when he learned that, Buck did not know whether the milk would be sold as Meadow Gold brand milk or as another brand. [Id.] At some

point prior to May 2020, Buck learned that Dean Foods was
processing and packaging Mainland Tanker Milk at the Honolulu
Dairy Processing Facility and selling it in Hawai`i under the
Meadow Gold brand. [Id. at ¶ 13.] Buck was aware that some of
products processed at the Honolulu Dairy Processing Facility
"had the phrase 'Hawaii's Dairy' on them, and other did not, and
[he] did not know the reason why." [Id.] However, he was not
aware that any Meadow Gold brand products containing Mainland
Tanker Milk had the phrases "Hawaii's Dairy" or "Made with
Aloha" on them prior to the May 2020. [Id. at ¶ 14.]

        In addition, Buck was never aware: of any Meadow Gold
brand products that contained Mainland Packaged Milk Products
for sale in Hawai`i being labeled with the phrase "Hawaii's
Dairy"; or any Meadow Gold brand product sold in Hawai`i with
the phrase "Made with Aloha," with statement such as those in
the Dairymen's Text, nor with the phrase "MOOhalo." [Id. at
¶¶ 6-11.] He makes the same assertions regarding Meadow Gold
brand milk or dairy products containing Mainland Tanker Milk,
except that he also asserts the image of Lani Moo was not used
on those products. See id. at ¶¶ 14-17.

### III.  **The Instant Motion**

        In the instant Motion, Defendants argue the images and
phrases at issue in this case have been used with the Meadow
Gold brand in Hawai`i "for over a decade, if not longer," even

though Meadow Gold "was selling principally 'mainland milk' . . . ." [Motion, Mem. in Supp. at 1-2.] Defendants contend Plaintiff's Lanham Act claim is barred by the doctrine of laches, and Plaintiff's state law claims are barred by either the laches doctrine or the applicable statute of limitations. [Id. at 1.] Defendants therefore ask this Court to grant summary judgment in its favor as to all of Plaintiff's claims. [Id. at 23.]

**DISCUSSION**

I.    **Waiver**

At the outset, this Court must address Plaintiff's argument that Defendants waived any laches and statute of limitations defenses by failing to plead them in their Answer. [Mem. in Opp. at 6 (citing Fed. R. Civ. P. 8(c)(1), 10(b), 12(b)).] Defendants do not contest the fact that no laches defense is asserted in their Answer, but they argue that this does not constitute a waiver of the defense. [Reply at 11.]

The Ninth Circuit has "liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings. A defendant may thus raise an affirmative defense for the first time in a motion for judgment on the pleadings, but only if the delay does not prejudice the plaintiff." Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 713 (9th Cir.

2001) (citations and internal quotation marks omitted). The
Ninth Circuit has also recognized that:

> There is no prejudice to a plaintiff where an
> "affirmative defense would have been dispositive"
> if asserted "when the action was filed." Owens v.
> Kaiser Found. Health Plan, Inc., 244 F.3d 708,
> 713 (9th Cir. 2001). Rather, a party must point
> to a "tangible way in which it was prejudiced by
> the delay." See Ledo Fin. Corp. v. Summers, 122
> F.3d 825, 827 (9th Cir. 1997).

Garcia v. Salvation Army, 918 F.3d 997, 1008–09 (9th Cir. 2019).

Plaintiff argues Defendants should not be allowed to
raise a laches/statute of limitations defense for the first time
in the instant Motion because Plaintiff has been prejudiced by
Defendants' delay in asserting the defense. According to
Plaintiff, the delay

> deprived [Plaintiff] of a fair and meaningful
> opportunity to develop evidence to respond to the
> Motion. Among other things, [Plaintiff] had
> propounded multiple written discovery requests
> and conducted [Federal] Rule [of Civil
> Procedure] 30(b)(6) depositions of all Defendants
> before the Motion was filed. Had [Plaintiff]
> known that Defendants would assert laches and
> statute of limitations defenses, it would have
> included discovery aimed at those defenses,
> identified specific topics relevant to those
> defenses in the 30(b)(6) deposition notices, and
> examined each deponent on this issue.

[Mem. in Opp. at 9 (citing LaPorte Decl. ¶ 16).]

On June 26, 2023, Defendants' counsel met with
Plaintiff's counsel for a prefiling conference regarding the
Motion, as required by Local Rule 7.8. See Defs.' Reply CSOF,

23

Supplemental Declaration of Erika L. Amatore ("Amatore Reply
Decl.") at ¶ 4. At that time, the discovery period was still
open. See Second Amended Rule 16 Scheduling Order, filed 4/3/23
(dkt. no. 104), at ¶ 5a (stating the discovery deadline is
October 20, 2023). Thus, there was sufficient time for Plaintiff
to conduct discovery regarding the issues identified during the
prefiling conference.

  Although Plaintiff's counsel emphasizes that the
Rule 30(b)(6) depositions for all Defendants had been conducted
by the time Defendants filed the Motion, [LaPorte Decl. at
¶ 15,] Defendants' counsel points out that the Rule 30(b)(6)
depositions of Hollandia's and MGDH's witnesses were conducted
after the prefiling conference, and Plaintiff's counsel
questioned those witnesses about issues related to the Motion,
[Amatore Reply Decl. at ¶ 6]. Defendants acknowledge that
Heritage's and Saputo's Rule 30(b)(6) witnesses were deposed
prior to the prefiling conference, but Defendants point out that
Plaintiff never requested to reopen those depositions to address
the issues raised in the Motion. [Id. at ¶ 5.] Further,
Sadeghi's deposition was conducted after the filing of the
Motion, and Plaintiff's counsel questioned him about issues
related to the Motion. [Id. at ¶ 7.]

  Plaintiff also served multiple discovery requests
after the prefiling conference, and those requests addressed

issues raised in the Motion. [Id. at ¶ 8.] For example,
Plaintiff requested that MGDH produce "[a]ll Documents depicting
any dairy products sold in Hawaii by Dean Foods or its
predecessors at any time from 1994 through 2020 with the phrase
'Made with Aloha' on the container." [Amatore Reply Decl.,
Exh. 32 (Plaintiff Hawaii Foodservice Alliance, LLC's Fifth Set
of Requests for Production and Answers to Interrogatories to
Defendant Meadow Gold Dairies Hawaii, LLC, dated 7/28/23) at
Request for Production No. 46.] Plaintiff made similar requests
regarding Lani Moo's image, "MOOhalo," "Dairymen's Association,"
the Dairymen's Text, "Hawaii's Dairy," [Id. at Request for
Production Nos. 47-55.]

        To the extent that Plaintiff believed Defendants'
delay in asserting their laches/statute of limitations defense
impaired Plaintiff's ability to respond to the Motion, Plaintiff
could have sought additional time to conduct discovery to oppose
the Motion. See Fed. R. Civ. P. 56(d)(2). Plaintiff, however,
did not do so. This Court finds that, under the circumstances of
this case, Plaintiff has failed to identify "a tangible way in
which it was prejudiced by the delay" in asserting Defendants'
laches/statute of limitations defense. See Garcia, 918 F.3d at
1009 (quotation marks and citation omitted). This Court
therefore rejects Plaintiff's waiver argument and will consider

Defendants' laches/statute of limitations defense. This Court
next turns to the merits of Defendants' laches defense.

## II.  __Laches__

The affirmative defense of laches "is an equitable
time limitation on a party's right to bring suit, which is
derived from the maxim that those who sleep on their rights,
lose them." Miller v. Glenn Miller Prod., Inc., 454 F.3d 975,
997 (9th Cir. 2006) (per curiam) (citations and internal
quotation marks omitted).

> "The application of the defense of laches is
> committed to the sound discretion of the district
> court." A.C. Aukerman Co. v. R.L. Chaides Const.
> Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992),
> _abrogated on other grounds by_ SCA Hygiene Prod.
> Aktiebolag v. First Quality Baby Prod., LLC, ---
> U.S. ----, 137 S. Ct. 954, 197 L. Ed. 2d 292
> (2017). As an equitable doctrine, laches is not
> applied using "mechanical rules." Id. (quoting
> Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.
> Ct. 582, 90 L. Ed. 743 (1946)). A court must look
> at all the "particular facts and circumstances"
> and "weigh the equities of the parties." Id.

Bluetooth SIG, Inc. v. FCA US LLC, 463 F. Supp. 3d 1169, 1196
(W.D. Wash. 2020).[10]

Laches can be asserted to "defeat an otherwise valid
claim under the Lanham Act."[11] La Quinta Worldwide LLC v.

---

[10] On appeal, Bluetooth SIG was vacated and remanded on
other grounds. 30 F.4th 870 (9th Cir. 2022).

[11] For purposes of the instant Motion, it is not necessary
to for this Court to address the merits of Plaintiff's claims.
(. . . continued)

Q.R.T.M., S.A. de C.V., 762 F.3d 867, 878 (9th Cir. 2014)
(quotation marks and citation omitted). It can also be asserted
against Hawai`i Revised Statutes Chapter 480 UMOC claims. See
Kowalski v. Anova Food, LLC, Civil No. 11-00795 HG-RLP., 2014 WL
8105172, at *14 (D. Hawai`i Dec. 31, 2014) ("The laches defense
is applicable to patent infringement claims as well as Lanham
Act claims for false advertising and state law claims for unfair
competition." (citing Jarrow Formulas, Inc. v. Nutrition Now,
Inc., 304 F.3d 829, 835 (9th Cir. 2002))).

        This Court is not aware of any case law directly
addressing the issue of whether a laches defense can be asserted
against a Chapter 481A claim. However, because the nature of
Plaintiff's Chapter 481A claim is similar to Plaintiff's Lanham
Act claim and UMOC claim, this Court concludes that the same
limitations period applies and that a laches defense is also
available. See Second Amended Complaint at ¶ 120 (alleging
Defendants violated Chapter 481A by, *inter alia*, using
"'deceptive representations or designations of geographic origin
in connection with goods' and causing 'likelihood of confusion
or misunderstanding as to the source' of goods in the conduct of
one's business, vocation, or occupation"); Flynn v. Marriott

---

To the extent that Plaintiff has viable claims, the Motion asks
this Court to determine whether Defendants have valid defenses
that preclude Plaintiff from recovering.

Ownership Resorts, 165 F. Supp. 3d 955, 964-65 (2016) (citations omitted) (applying Chapter 480 limitations period to Chapter 481A and Haw. Rev. Stat. Chapter 514E claims because "an examination of the allegations . . . reveals that the nature of the claim is ultimately a Chapter 480 [unfair and deceptive acts and practices] claim" (citing Au v. Au, 63 Haw. 210, 214, 626 P.2d 173, 177 (1981))).

Plaintiff's Section 708-781 claim is not subject to the Chapter 480 limitations period. See Hawaii Health & Welfare Tr. Fund for Operating Eng'rs v. Philip Morris, Inc., 52 F. Supp. 2d 1196, 1200 (D. Hawai`i 1999) (applying two-year limitations period in Haw. Rev. Stat. § 657-7 to a § 708-781 claim). However, because the Section 708-781 claim is similar in nature to Plaintiff's Lanham Act false advertising claim, to which laches can apply, this Court concludes that a laches defense is also available against Plaintiff's Section 708-781 claim.

**A.   Tacking**

This Court must first address MGDH's argument that, for purposes of laches, MGDH "may 'tack' [on] the time that the intellectual property at issue was owned and used by [MGDH]'s predecessor." [Motion, Mem. in Supp. at 2 n.1 (citations omitted).]

28

> "The federal circuit has not, in the laches
> context, prescribed the standard to be applied in
> determining whether an alleged infringer may
> 'tack on' delay periods from prior infringing
> activity[.]" Engineered Prods. Co. v. Donaldson
> Co., Inc., 165 F. Supp. 2d 836, 854 (N.D. Iowa
> 2001). Regardless, there "never has been any
> magic in corporate entity[,]" and disallowing
> tacking for a successor infringing corporation
> "is not in the ends of justice" and promotes
> "form-over-substance." Raber v. Pittway Corp.,
> No. C 92-2581, 1994 WL 374542, at *3 (N.D. Cal.
> July 11, 1994) (quoting Am. Home Prods. Corp. v.
> Lockwood Mfg. Co., 173 U.S.P.Q. 486 (S.D. Ohio
> 1972), aff'd, 483 F.2d 1120 (6th Cir. 1973)).
> Consequently, several courts have adopted the
> rule that tacking should be allowed "in cases
> where only the ownership of the defendant-
> business changes hands." Id. (quoting 6 Donald S.
> Chisum, Patents, § 19.05 [2][a][ii]); Radar
> Indus., Inc. v. Cleveland Die & Mfg. Co., 632 F.
> Supp. 2d 686, 692 (E.D. Mich. 2009); Five Star
> Mfg., Inc. v. Ramp Lite Mfg., Inc., 44 F. Supp.
> 2d 1149, 1156 (D. Kan. 1999) (a defendant may
> tack when there is "some formal transfer of the
> technology and good-will of the accused
> product"); Sec. & Access (Elec. Media) Ltd. v.
> Nokia, Inc., No. 95-1689, 1997 WL 158308, at *4
> (M.D. Fla. Mar.24, 1997).

Enel Co. v. Schaefer, No. 12-cv-1369-IEG(WMC), 2013 WL 5727421,

at *6 (S.D. Cal. Oct. 22, 2013) (alterations in Enel Co.)

(adopting rule allowing tacking in a patent infringement

action).

Further, there is no strict definition of a successor

or party-in-privity that must be met for a party to avail itself

of tacking; the issue of whether tacking is available turns on

the particular circumstances of the case. For example, in

Bluetooth SIG, the district court ruled:

weighing the facts and circumstances, the Court
finds that FCA [US LLC] may "tack on" Chrysler's
use of Bluetooth[ SIG, Inc.]'s trademarks for
purposes of laches. <u>See, e.g.</u>, <u>Reese v. AT & T
Mobility II, LLC</u>, No. 2:13-cv-05198-ODW-PLA, 2014
WL 1873046, at *5 (C.D. Cal. May 9, 2014) ("So
long as the corporate name change did not have
the effect of concealing the entity's identity—
such that [plaintiff] was impeded from bringing
suit-there is no principled reason to refuse to
allow AT & T to assert Cingular's laches defense.
To hold otherwise to [sic] would be to exalt form
over substance.") (citation omitted); <u>Enel Co.,
LLC v. Schaefer</u>, No. 12-CV-1369-IEG WMC, 2013 WL
5727421, at *4 (S.D. Cal. Oct. 22, 2013)
(collecting cases and finding that "the Federal
Circuit did not explicitly or implicitly narrowly
define a successor or privity in the manner that
Plaintiffs suggest").

463 F. Supp. 3d at 1197 (alterations in <u>Bluetooth SIG</u>).

MGDH did not acquire all of Dean Foods' assets in
Hawai`i. <u>See, e.g.</u>, Sadeghi Reply Decl. at ¶ 4 (explaining why
the Honolulu Dairy Processing Facility was not part of the MGDH
Acquisition). However, the MGDH Acquisition did involve
substantial Meadow Gold assets in Hawai`i, "including its
intellectual property, product formulations, goodwill, Hilo
processing facility, and Maui and Kauai distribution
operations," and MGDH later acquired a distribution center in
Waipahu in a separate transaction. [Sadeghi Reply Decl. at ¶ 5.]
Further, it undisputed that, since the acquisition from Dean
Foods, MGDH has been the only entity distributing Meadow Gold
brand products in Hawai`i.

Plaintiff emphasizes that MGDH refused to assume Dean Foods' obligations to Meadow Gold employees in Hawai`i - including obligations under collective bargaining agreements, benefit plans, and pension plans – and the bankruptcy court expressly stated that MGDH was not successor, alter ego, or continuation of Dean Foods. See Mem. in Opp. at 4-5 (citing LaPorte Decl., Exh. B (Sadeghi Depo.) at 75, Exh. C (4/28/20 Bankruptcy Order) at 26, ¶ 16). However, as previously noted, there is no strict definition of a successor or party-in-privity that must be satisfied in order for tacking to apply. See Bluetooth SIG, 463 F. Supp. 3d at 1197 (citing Enel Co., LLC v. Schaefer, No. 12-CV-1369-IEG WMC, 2013 WL 5727421, at *4 (S.D. Cal. Oct. 22, 2013)). MGDH effectively assumed Dean Foods' distribution of the Meadow Gold brand in Hawai`i, and the specific portions of Dean Foods' Hawai`i operations that were excluded from the MGDH Acquisition "did not have the effect of concealing [MGDH's] identity – such that [Plaintiff] was impeded from bringing suit." See Reese, 2014 WL 1873046, at *5. Therefore, having considered the "particular facts and circumstances" of this case and "weigh[ing] the equities of the parties," this Court concludes that tacking is available to MGDH. See A.C. Aukerman, 960 F.2d at 1032.

B.    __MGDH's Laches Defense__

A two-step analysis applies when a laches defense is
asserted.

> First, we determine whether the limitations
> period for laches has expired. If the period has
> not expired before suit was filed, there is a
> strong presumption against the laches defense.
> [Tillamook Country Smoker, Inc. v. Tillamook
> Cnty. Creamery Ass'n, 465 F.3d 1102, 1108 (9th
> Cir. 2006).] That presumption is reversed if the
> laches period expired before the suit was filed.
> Id. . . . Second, if the laches period expired
> before suit was filed, we apply the factors
> listed in E-Systems, Inc. v. Monitek, Inc., 720
> F.2d 604, 607 (9th Cir. 1983), to determine
> whether "the trademark owner's delay in filing
> suit was unreasonable and, therefore, barred,"
> Tillamook, 465 F.3d at 1108. . . .
>
>     . . . . To prove that a delay in filing was
> unwarranted, the party asserting a laches defense
> must show that the following six factors weigh in
> its favor:
>
>> (1) strength and value of trademark rights
>> asserted; (2) plaintiff's diligence in
>> enforcing mark; (3) harm to senior user if
>> relief denied; (4) good faith ignorance by
>> junior user; (5) competition between senior
>> and junior users; and (6) extent of harm
>> suffered by junior user because of senior
>> user's delay.
>
> E-Systems, 720 F.2d at 607; see also Tillamook,
> 465 F.3d at 1108. To benefit from this equitable
> defense, "[t]he party asserting laches must
> demonstrate that it has 'suffered prejudice as a
> result of plaintiff's unreasonable delay in
> filing suit.'" Tillamook, 465 F.3d at 1108
> (quoting Jarrow Formulas, Inc. v. Nutrition Now,
> Inc., 304 F.3d 829, 835 (9th Cir. 2002)).

La Quinta, 762 F.3d at 878 (some alterations in La Quinta).

32

As to the first step,

> [t]he limitations period for laches starts
> "from the time the plaintiff knew or should have
> known about its potential cause of action."
> [Jarrow Formulas, 304 F.3d] at 838; see also
> ProFitness Physical Therapy Center v. Pro-Fit
> Orthopedic and Sports Physical Therapy P.C., 314
> F.3d 62, 70 (2d Cir. 2002) ( "[A] plaintiff
> should not be obligated to sue until its right to
> protection has ripened such that plaintiff knew
> or should have known . . . that [it] had a
> provable infringement claim against defendant.");
> Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455,
> 462 (4th Cir. 1996) (holding that the trademark
> owner need not sue "until the likelihood of
> confusion looms large") (citation and internal
> quotation marks omitted).

Tillamook Country Smoker, 465 F.3d at 1108 (some alterations in

Tillamook).

As previously noted, Plaintiff admits that Lani Moo

was used in Meadow Gold marketing and advertising for decades,

and that the phrase "Hawaii's Dairy" was used in Meadow Gold

advertisements since 1990. [Pltf.'s CSOF at ¶¶ 14, 17-18.]

Plaintiff also presented testimony acknowledging the historical

connection between the Dairymen's Association and Meadow Gold

Dairies Hawaii. See Marcello Decl. at ¶ 4. Further, although the

parties dispute the degree, Plaintiff admits that the production

of milk in Hawai`i began to decline after 1982 and that milk

imports began in 1984. See Pltf.'s CSOF at ¶ 8. Plaintiff

admits, by 2004, some Meadow Gold brand products distributed in

Hawai`i bore the tagline "Hawaii's Dairy" while other products

33

did not, but, according to Plaintiff, those that bore the tagline were "packaged in Hawaii." See id. at ¶ 21; see also Defs.' CSOF at ¶ 21. However, Buck acknowledged that he did not know why some products processed at the Honolulu Dairy Processing Facility had the tagline "Hawaii's Dairy" on the package but others did not. See Buck Decl. at ¶ 13. The historically used Lani Moo mascot and "Hawaii's Dairy" tagline imply a **connection** to Hawai`i,[12] but they do expressly convey that the dairy products **originated** in Hawai`i, *i.e.* that the milk came from cows located in Hawai`i. Thus, to the extent that Plaintiff's claims are based upon a theory that the use of Hawaii-themed images and phrases in connection with the sale of Mainland Milk Products gives the false impression regarding the origin of the milk, the same or similar conduct was occurring years before the MGDH Acquisition. Information was available by approximately 2004 that could have potentially supported a cause of action by a Meadow Gold competitor in Hawai`i. Thus, by 2008 when Plaintiff began to distribute milk and dairy products in

---

[12] Defendants have presented some evidence that Dean Foods used the "Made with Aloha" tagline before the MGDH Acquisition. See Sadeghi Decl. at ¶ 10. Plaintiff has acknowledged that some MGDH employees, while they were employed by Dean Foods, used the phrase "Made with Aloha" in their email correspondence, but they assert Dean Foods never used the phrase on milk products. See Pltf.'s CSOF at ¶ 31 (some citations omitted) (citing Marcello Decl. at ¶ 14). This Court cannot resolve this factual dispute on summary judgment, but this dispute does not preclude a ruling on summary judgment.

Hawai`i, it knew or should have known of its potential cause of
action. This Court therefore concludes that, by the time
Plaintiff filed this action in November 2021, the laches period
for each of its claims against MGDH based on the use of those
images and statements had expired. This ruling applies to the
use of the Lani Moo mascot and the "Hawaii's Dairy" tagline, as
well as to other images and phrases that suggest a connection to
Hawai`i without making a representation about origin, including
"MOOhalo," "Made with Aloha," and notations of the historical
connection with the Dairymen's Association. These will be
referred to collectively as "the Hawai`i-Themed Images and
Phrases."

        In contrast, the Dairymen's Text contains an express
representation about the origin of the products. See Marcello
Decl. at ¶ 10 ("**Today we** operate statewide and continue to
**manufacture fresh** milk, dairy, juice and nectar products **in
Hawai`i.**" (emphases added)). Defendants have not presented any
evidence that Dean Foods or any of MGDH's other predecessors
used similar statements representing that Meadow Gold brand
products were manufactured fresh in Hawai`i. Viewing the record
in the light most favorable to Plaintiff,[13] this Court assumes

_____

        [13] In considering Defendants' Motion, this Court must view
the record in the light most favorable to Plaintiff as the
                                        (. . . continued)

that this portion of the Dairymen's Text was not used on Meadow
Gold brand products until after the MGDH Acquisition in 2020.
Therefore, at the time Plaintiff filed the instant case, the
laches period for Plaintiff's claims based on the use of that
portion of the Dairymen's Text had not expired, and there is a
strong presumption against the laches defense. See La Quinta,
762 F.3d at 878. MGDH is not entitled to summary judgment as to
their laches defense against the portion of Plaintiff's claims
based upon the use of the portion of the Dairymen's Text which
represents that Meadow Gold products are manufactured fresh in
Hawai`i. The Motion is denied as to that portion of Plaintiff's
claims.

       This Court next turns to the E-Systems factors to
analyze whether Plaintiff's delay in filing claims based on the
use of the Hawai`i-Themed Images and Phrases was unreasonable.[14]
As to the first factor, it is undisputed that the Meadow Gold
brand is well-known and has a long history in Hawai`i.
Similarly, the Lani Moo mascot and the "Hawaii's Dairy" are also
well established. As to the second factor, based on this Court's
finding that Plaintiff knew or should have known about its

---

nonmoving party. See Harris v. Cnty. of Orange, 17 F.4th 849,
855 (9th Cir. 2021).

       [14] This Court has modified the E-Systems factors to suit the
claims in this case because the original factors addressed
trademark infringement claims. See E-Systems, 720 F.2d at 607.

potential claims by approximately 2008, this Court finds that Plaintiff was not diligent in litigating its claims based upon the Hawai`i-Themed Images and Phrases.

As to the third and fifth E-System factors, Plaintiff and MGDH are competitors, and Plaintiff alleges Defendants' actions give MGDH an unfair advantage. See Defs.' CSOF at ¶¶ 26-27 (regarding Plaintiff's and MGDH's respective shares of the wholesale milk distribution market); Pltf.'s CSOF at ¶¶ 26-27 (admitting Defs.' ¶¶ 26-27, with a clarification as to the definition of the wholesale milk distribution market); see also, e.g., Second Amended Complaint at ¶ 104 (unfair competition allegation).

As to the fourth and sixth E-System factors, Sadeghi states that, when he entered into the MGDH Acquisition, he "relied upon the ability to continue to use [Meadow Gold's] Hawai`i-themed IP, regardless of whether [Meadow Gold's] milk was sourced locally or from the mainland." [Sadeghi Decl. at ¶ 7.] MGDH also relied upon the continued ability to use the Hawai`i-Themed Images and Phrases when it entered into transactions with the Dairy Farmers and other vendors. See id. at ¶ 11. Further, since the acquisition, "MGD[H] has spent over $625,000 in marketing, advertising, and developing its Hawai`i-themed branding, including the 'Made with Aloha' tagline." [Id. at ¶ 10.] In light of Meadow Gold's long-standing use of the

Lani Moo mascot and the "Hawaii's Dairy" tagline, even after the incorporation of Mainland Milk Products, this Court finds that Sadeghi had a good faith belief that the use of the Hawai`i-Themed Images and Phrases was possible.

Having considered all of the E-Systems factors, this Court concludes that Plaintiff unreasonably delayed in bringing its claims based on the use of the Hawai`i-Themed Images and Phrases and that MGDH suffered prejudice as a result of the unreasonable delay. Therefore, even viewing the record in the light most favorable to Plaintiff, there are no genuine issues of material fact, and this Court concludes, as a matter of law, that MGDH has a valid laches defense against Plaintiff's claims based on the use of the Hawai`i-Themed Images and Phrases. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

**C.    Unclean Hands**

Plaintiff next argues that, even if laches would otherwise apply, MGDH is not entitled to summary judgment as to the laches defense because there are triable issues of fact as to the issue of whether MGDH has unclean hands. [Mem. in Opp. at 25-26.]

38

> A plaintiff can prevail on the "unclean hands"
> counter-defense to laches "only if the court is
> left with a firm conviction" that the defendant
> acted willfully. Jarrow Formulas Inc. v.
> Nutrition Now Inc., 304 F.3d 829, 842 (9th Cir.
> 2002). This is a demanding standard. See id. Eat
> Right [Foods Ltd.'s ("Eat Right")] circumstantial
> evidence that Whole Foods [Market Pacific
> Northwest, Inc. ("Whole Foods")] must have known
> it was infringing because it carried Eat Right
> cookies is not sufficient to show unclean hands.
> As in Jarrow, though Whole Foods' hands "are not
> as 'clean as snow,'" neither do "its actions rise
> to the level of unclean hands." See id. (citation
> omitted).

Eat Right Foods Ltd. v. Whole Foods Mkt., Inc., 779 F. App'x

471, 474 (9th Cir. 2019).

Plaintiff points to correspondence that it argues

raises a triable issue of fact as MGDH's unclean hands. [Mem. in

Opp. at 25-26 (citing Marcello Decl., Exh. A; LaPorte Decl.,

Exh. K at SAP000065).] Exhibit A to the Marcello Declaration is

the May 22, 2020 email chain between Marcello, Sadeghi, and

Muranaka, discussing proofs for cartons of Meadow Gold products

for Hollandia to use. [Dkt. no. 148-6.] In one message, Marcello

wrote: "Can we put the 'Made with Aloha' logo on there given

these specific cartons will be co-packed at Hollandia?" [Id. at

PageID.1013.] Muranaka responded, "I don't see why not. I'd like

all of our labels and cartons stating 'Made with Aloha'." [Id.

at PageID.1016.] He later wrote:

> I know it's a stretch especially if people know
> that it is packaged on the mainland. My thought
> is that anything labeled with Meadow Gold

> ("Hawaii's Dairy) [sic] and distributed
> philosophically is Made with Aloha. In other
> words, Hawaii's Dairy and Made in [sic] Aloha is
> synonymous.
>
> We may be challenged in the future, but for now
> we need to build a local brand.

[Id. at PageID.1019-20.] Sadeghi denies that those statements
are attributable to him or to MGDH. See Sadeghi Reply Decl. at
¶ 8. Sadeghi states that Muranaka "was not an MGD[H] employee,
contractor, or consultant. Instead, he was interested in
purchasing Meadow Gold, and was at that time engaged in
negotiations that ultimately ended. Any statements he made were
his alone, and not those of me or MGD[H]." [Id.] Sadeghi does
not deny being copied on the email in which Muranaka made those
statements, and there is no indication in the record that
Sadeghi responded to Muranaka's email to dispute Muranaka's
statements. In considering Defendants' Motion, this Court cannot
weigh the credibility of Muranaka's and Sadeghi's statements.
See Estate of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1009
n.10 (9th Cir. 2017) ("At the summary judgment stage,
'[c]redibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury
functions, not those of a judge.'" (alteration in Lopez)
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106
S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).

Viewing the record in the light most favorable to Plaintiff, the emails in Plaintiff's Exhibit A show that Sadeghi had notice of the fact that the use of the phrase "Made with Aloha" on Mainland Milk Products could be subject to challenge. However, even viewing the record in the light most favorable to Plaintiff, the mere recognition that a challenge might be brought in the future is not enough to leave this Court "with a firm conviction that [MGDH] acted willfully." See Eat Right Foods, 779 F. App'x at 474 (citation and internal quotation marks omitted).

Exhibit K to the LaPorte Declaration is an email chain, dated from April 13, 2022 to June 22, 2022, between various MGDH personnel and various Saputo personnel, regarding the review of changes to the Meadow Gold packaging. [Dkt. no. 148-19.] The page that Plaintiff relies upon has a proof of a milk carton panel with the Dairymen's Text. [Id. at SAP000065.] On May 16, 2022, Dave Connor, Saputo Regional Sales Manager, wrote to Megahn Chun ("Chun") at MGDH, stating "there is still a concern with the language on the on the [sic] far left panel (glamour shot) of the whipping cream, the wording we feel can be miss-leading [sic]." [Id.] On May 23, 2022, Chun responded that she would check with Sadeghi about it. [Id. at SAP000064.] On May 25, 2022, Chun wrote:

> Thank you for red flagging that, can we replace
> that copy with the below:
>
> *At home chefs love Meadow Gold's 36% heavy*
> *whipping cream! Add a touch of rich creaminess to*
> *homemade soups, sauces, mashed potatoes, eggs and*
> *salad dressings. Top your favorite berries and*
> *warm baked goods with a dollop of cool freshness.*
> *Whether it's sweet or savory, Meadow Gold heavy*
> *whipping Cream brings out the best in any dish*
> *for your `ohana.*

[Id. at SAP000063 (emphasis in original).] The change was

approved by all persons involved for both parties. See id. at

000058-61.

       This Court has already ruled that MGDH is not entitled

to summary judgment as to Plaintiff's claims based on the use of

the portion of the Dairymen's Text which represents that Meadow

Gold products are manufactured fresh in Hawai`i. Thus, it is not

necessary to address the issue of whether unclean hands preclude

a laches defense as to those claims. Even viewing the record in

the light most favorable to Plaintiff, Exhibit K does not raise

a genuine issue of fact for trial as to whether MGDH acted

willfully in its use of the Hawai`i-Themed Images and Phrases.

See Jarrow Formulas, 304 F.3d at 842.

       Further, even considering Exhibits A and K together

with the record as a whole, Plaintiff has failed to raise a

triable issue of fact as to whether MGDH's actions rise to the

level of unclean hands. This Court therefore concludes that, as

a matter of law, Plaintiff cannot prevail on its unclean hands
counter-defense to MGDH's valid laches defense.

      **D.**   **Ruling**

        This Court has concluded that laches applies to
Plaintiff's claims against MGDH based upon MGDH's use of the
Hawai`i-Themed Images and Phrases, and this Court has concluded
that laches does not apply to Plaintiff's claims against MGDH
based upon of MGDH's use of the portion of the Dairymen's Text
which represents that Meadow Gold products are manufactured
fresh in Hawai`i. The Motion is therefore denied as to MGDH's
request for summary judgment as to Plaintiff's claims based on
that portion of the Dairymen's Text. MGDH is entitled to summary
judgment as to all of Plaintiff's other claims against it.[15]

        However, "a laches defense is personal to the
defendant raising it[.]" Israel Bio-Eng'g Project v. Amgen Inc.,
401 F.3d 1299, 1306 (Fed. Cir. 2005). The Dairy Farmers
therefore cannot assert a laches defense based on MGDH's laches
defense. Further, any statute of limitations defense that the
Dairy Farmers assert would be distinct from the defenses that
MGDH raised in the instant Motion. Defendants' Motion is
therefore denied to the extent that it seeks summary judgment in

---

      [15] Even if the laches defense did not apply to Plaintiff's
state law claims, this Court would make the same ruling as to
Plaintiff's against MGDH by applying the same reasoning in the
laches analysis to MGDH's statute of limitations defense.

favor of the Dairy Farmers. The Dairy Farmers' defenses are more appropriately addressed in connection with their Motion for Partial Summary Judgment ("Dairy Farmers' Motion"), [filed 10/20/23 (dkt. no. 158)]. <u>See</u> Minute Order - EO: Court Order Regarding Pending Motions for Summary Judgment and the Trial Date, filed 1/29/24 (dkt. no. 174), at PageID.1633 (allowing the Dairy Farmers to amend their motion based on the rulings on Defendants' Motion and issuing a briefing schedule).

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment, filed July 24, 2023, is HEREBY GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED insofar as summary judgment is granted in favor of MGDH as to Plaintiff's claims against MGDH based on the use of the Hawai`i-Themed Images and Phrases. The Motion is DENIED as to Plaintiff's claims against MGDH based on the use of the portion of the Dairymen's Text which represents that Meadow Gold products are manufactured fresh in Hawai`i. Further, the Motion is DENIED to the extent that it seeks summary judgment in favor of the Dairy Farmers.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, January 31, 2024.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

HAWAII FOODSERVICE ALLIANCE, LLC VS. MEADOW GOLD DAIRIES HAWAII, LLC, ET AL.; CV 21-00460 LEK-WRP; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT